**DONMAR ENTERPRISES, INC., Plaintiff,**

v.

**SOUTHERN NATIONAL BANK OF NORTH CAROLINA and Southern International Corp., Defendants.**

No. 3:92CV206–P.

United States District Court, W.D. North Carolina, Charlotte Division.

July 29, 1993.

James O. Cobb, Robert S. Adden, Jr., Ruff, Bond, Cobb, Wade & McNair, Charlotte, NC, for plaintiff.

Irvin W. Hankins, Josephine H. Hicks, Parker, Poe, Adams & Bernstein, Charlotte, NC, for defendants.

### *MEMORANDUM OF DECISION*

ROBERT D. POTTER, District Judge.

**THIS MATTER** is before the Court on Defendant's motion to dismiss or for summary judgment, supported by affidavits and a memorandum, as well as a motion requesting a protective order and to quash subpoena, filed November 2, 1992. Plaintiff responded by memorandum, accompanied by an affidavit, filed November 19, 1992, to the motion to dismiss and for summary judgment.

The Court has reviewed the pleadings, motions, briefs, affidavits and applicable legal authorities. Based upon its review of this case, the Court believes summary judgment is the appropriate vehicle for addressing part of the instant motion and Fed.R.Civ.P. 12(b)(6) is appropriate for the other portion of the motion. Accordingly, the Court makes the following findings of fact and conclusions of law in light of the standards mandated by Rule 56. Fed.R.Civ.P. 56 (West 1993).

### *MOTION FOR PROTECTIVE ORDER*

On November 2, 1992, Defendant filed a motion for a protective order to quash subpoenas issued to Rebecca Stephens and Rita Mashburn. Because the ruling of the Court

will render this motion moot, the Court will deny it as moot.

### STATEMENT OF FACTS

This action concerns a dispute between these litigants arising from a foreign currency exchange agreement entered into by Plaintiff and Stephen's Trading Corporation (STC) involving $540,680 in U.S. dollars for 280,000 British pounds. This transaction involved an electronic transfer of the $540,680 through Defendant, who served as STC's bank, from Plaintiff to STC.

Donmar Enterprises, Inc. (Plaintiff) purchases and sells sunroofs and related automotive accessories. This enterprise requires Plaintiff to do business with companies in Great Britain which in turn requires it to exchange U.S. dollars for British pounds. On February 25, 1991, Plaintiff contracted with Stephen's Trading Corporation (STC), a trader in foreign currency owned by Mr. Stephen Selleck, to purchase a sum of $540,680 U.S. dollars in British pounds (i.e. 280,000 GBP). To consummate the currency exchange, Plaintiff and STC agreed that on February 26 1991, Plaintiff would wire $15,000 as a margin to hold the transaction, and on March 27, 1991 Plaintiff would wire $524,276.71 to Southern International, Corp.[1] from First Union Bank (Plaintiff's bank) in Florida.

Plaintiff and STC agreed that they would be joint beneficiaries of the monies wired to SNB. Moreover, both parties agreed that the President of Donmar Enterprises, Inc., Kal Levinson, would provide written authorization to STC designating the amount of foreign currency Plaintiff wished to purchase and where the foreign currency was to be transferred. Furthermore, Selleck agreed to deliver Plaintiff's written instructions to SNB to assist SNB in conducting the transaction of U.S. currency for foreign currency. However, neither party contends SNB ever received Plaintiff's written instructions given to STC either from STC or Plaintiff. Similarly, neither Plaintiff nor SNB contend SNB was directed not to deposit the funds into the account of its customer, and a beneficiary, STC.

The February 26 transaction went forward with First Union wiring $15,000 to SNB accompanied by a wire notation which said, "ATTN INTL DIV RE STC DONMAR TRANS CODE 102–1011." The transfer of funds was completed without incident and SNB deposited the money into STC's account. On March 27, 1991, Selleck sent SNB a facsimile message which read, "INCOMING WIRE STC/DONMAR CODE 102–1011" to notify SNB that it could expect a wire of additional money from Plaintiff. Selleck further instructed SNB to deposit that money into STC's account numbered 251554225. The March 27 transfer went forward similarly with Plaintiff authorizing First Union to wire $524,276.71 to SNB accompanied by a wire notation which read, "ATTN INTL DIV REF SLC/DONMAR TRANS CODE 102–1011." The reference to SLC was remedied by Plaintiff who quickly wired SNB telling it "SLC ... SHOULD HAVE BEEN STC."

Once SNB received these funds, it deposited them into STC's account. Plaintiff did not have an account with SNB. On March 27, 1991, Plaintiff faxed STC and authorized it to transfer 200,000 GBP to Lloyd's Bank in Birmingham, England. That same day, Selleck directed SNB to wire all of the $524,276.71 deposited in STC's account to Discount Corp. of New York. The following day, STC directed SNB to wire funds in the amount of 200,000 GBP to Lloyd's Bank of Birmingham, England from its account. SNB informed STC that it lacked sufficient funds to accomplish the transfer to Lloyd's Bank. That day, STC informed Plaintiff that its account lacked sufficient funds to transfer the 200,000 GBP to Lloyd's. Plaintiff immediately contacted First Union and directed it to retrieve its money. Unfortunately for Plaintiff, the money was gone at the behest of Stephen Selleck's directions to SNB.

On April 3, 1991, SNB transferred $352,000.00 from STC's account to Lloyd's Bank and secured 200,000 GBP. Exactly what

1. Southern International, Corp. was later acquired by Southern National Bank of North Carolina (SNB), which explains why Southern National Bank is a party in this case. For purposes of clarity, the Court will refer only to SNB as the Defendant in this opinion.

happened after this, and what precipitated this transaction remains unclear, but is also not particularly relevant. In any event, Plaintiff claims it came up at least $187,276.71 short and now seeks to recover that amount from Defendant. Complaint at p. 3 ¶ 16, and Answer p. 4 ¶ 16. Plaintiff's suit seeks recovery of at least $187,276.71 under three legal theories; 12 C.F.R. 210 *et seq* (Federal Reserve Board Regulation J), common law negligence, and wrongful payment.

## DISCUSSION

### I. Regulation J as a private cause of action

Initially, the Court must resolve the jurisdictional matter of whether Regulation J, promulgated by the Federal Reserve Board, creates a private cause of action. 12 C.F.R. § 210 *et seq.* The parties to this action have briefed this question pursuant to this Court's order filed June 17, 1993. Based on the arguments of the parties, the Defendant's position that Regulation J furnishes private plaintiffs a cause of action against banks participating in the FedWire system, and the Court's independent review of the law, the Court is satisfied that 12 C.F.R. § 210 *et seq.* does establish a private cause of action. *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

### II. Pre-emptive Effect of Regulation J

The Court also ordered the parties to brief the issue of whether Regulation J pre-empts state law claims (such as those pled by Plaintiff) in cases involving the wire transfer of funds. The Court has reviewed the relevant authorities, the respective briefs, and based upon this review makes the following ruling.

The sort of pre-emption at stake here is that implicated where a federal regulatory agency such as the Federal Reserve Board "act[s] within the scope of its congressionally delegated authority...." *Louisiana Public Service Comm'n v. Federal Communication Comm'n,* 476 U.S. 355, 367, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). In such instances, it is well established that "Federal regulations have no less preemptive effect than federal statutes." *Fidelity Federal Savings and Loan Association v. De La Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). The question before this Court obviously does not involve whether North Carolina negligence or wrongful payment law are entirely invalidated by federal regulation. Instead, the Court must decide whether Regulation J has entirely occupied a field of regulation and thereby displaced alternative claims such as those afforded by the common law for losses occasioned by FedWire funds transfers.

Plaintiff simply argues its claims under North Carolina negligence and wrongful payment law are not pre-empted because those doctrines are not inconsistent with Regulation J's federal regulatory scheme. Defendant contends those claims are precluded by Regulation J because the Federal Reserve Board expressly intended to establish an exclusive remedy for losses occasioned by wire transfers, and multiple forms of liability creates conflicts between federal objectives and state tort theories.

"The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law." *Louisiana Public Service Comm'n,* 476 U.S. at 368, 106 S.Ct. at 1898, 90 L.Ed.2d 369. The pre-emptive effect of a federal law depends on whether it bears any of the established traits of a pre-emptive regulation. *See, Baker, Watts & Co. v. Miles & Stockbridge,* 876 F.2d 1101, 1107 (4th Cir.1989). Federal law pre-empts state law either where "Congress evidences an intent to occupy a given field ...," or "it is impossible to comply with both state and federal law ...," or "state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984).

The starting point for determining congressional intent is the federal statute or regulation at issue. Where a federal lawmaking body explicitly provides for pre-emption in the statute or regulation, pre-emption is indubitable. *Jones v. Rath Packing Co.,* 430 U.S. 519, 524, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). However, this is rarely

the case. More common are those instances where Congress or a regulatory agency implicitly pre-empts state law by the "structure and purpose" of the federal regulation. *Id.* Here, Courts are to determine if Congress or the regulatory agency has otherwise provided its "clear manifestation of intention" before finding a federal regulatory scheme preempts state laws. *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 417, 93 S.Ct. 2507, 2515, 37 L.Ed.2d 688 (1973). The intent of the regulatory agency or Congress depends first upon the language of the statute or regulation employed, and then on such factors as the pervasiveness of the federal regulation, and the need for uniformity.

■ Pre-emption is disfavored where a regulatory agency seeks to displace the power of a sovereign state to act "unless and until Congress confers power upon it." *Louisiana Public Service Commission v. Federal Communications Commission,* 476 U.S. at 374, 106 S.Ct. at 1901. The Supreme Court has unmistakably spoken on the importance of presuming against pre-emption when a federal regulatory agency is acting to preempt the will of the states, especially where public safety and health are involved. *H.P. Welch Co. v. New Hampshire,* 306 U.S. 79, 59 S.Ct. 438, 83 L.Ed. 500 (1939). However, the Court has also said "the best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." *Id.*

## A) Regulation J

The regulatory measure at issue here is Regulation J, promulgated in 12 C.F.R. § 210 *et seq.* by the Federal Reserve Board. Regulation J was promulgated pursuant to the Federal Reserve Act[2] to implement guidelines for the receipt of money by "Any Reserve Bank ... from any of its member banks or other depository institutions...." 12 U.S.C. § 342. Specifically, the regulation

was issued by the authority vested in the Board of Governors of the Federal Reserve System to "make and promulgate ... regulations governing the transfer of funds and charges ... among Federal reserve banks ..." within the precise context of FedWire funds transfers.[3] *See,* 12 U.S.C. § 248(*o*); 12 C.F.R. § 210.25(a). According to § 210.25, the purpose of Subpart B, which adopts Article 4A of the UCC, is to "govern funds transfers through FedWire...." *Id.* This language permits no exceptions or limitations. The Court finds Congress has delegated authority to the Federal Reserve Board which is plenary in nature within the confines of its scope which the Court finds to be as broad as possible within the context of funds transfers through the FedWire system.

Regulation J adopts Article 4A of the Uniform Commercial Code as the governing regime for funds transfers within the FedWire system. 12 C.F.R. § 210.25(b)(1). Obviously, within the broad array of available remedial regimes, the Federal Reserve Board has opted only for an UCC-type remedy for flawed wire transfers. The commentary to § 210.25(b)(1)—complicated as it is—expressly addresses the sweep of its pre-emptive effect by providing that the Federal Reserve Board intended to,

> supersede or preempt inconsistent provisions of state law. It does not affect state law governing funds transfers that does not conflict with the provisions of subpart B of this part, such as Article 4A, as enacted in any state, as it applies to parties to funds transfers through FedWire whose rights are not governed by subpart B of this part." 12 C.F.R. § 210.25(a) Appendix A to Subpart B.

This commentary to § 210.25 explicitly says what the entire structure and purpose of the regulation implicitly provides—that Regulation J was promulgated to preclude regulation of wire funds transfers by any source of law other than Regulation J with a limited exception. The only area of law not pre-

---

**2.** 12 U.S.C.A. § 226 (West 1989).

**3.** Regulation J itself defines Fedwire as "the funds-transfer system owned and operated by the Federal Reserve Bank that is used primarily for the transmission and settlement of payment orders governed by this subpart." 12 C.F.R. § 210.26(e).

empted is that presented by a consistent provision of a state analog to Article 4A or other such "law governing funds transfers" which concerns matters not covered by Regulation J.

■ The commentary to Regulation J unambiguously says any inconsistent provision of state law is pre-empted by the Federal Reserve Board's adoption of Article 4A. Unfortunately, the regulations nowhere explain what is meant by an inconsistent provision of state law. The Court believes any legal remedies provided for by state law which contradict or are duplicative of the remedies afforded by Regulation J and its purposes are inconsistent provisions within the meaning of 12 C.F.R. § 210.25(a). A contradictory state law cause of action is obviously inconsistent with Regulation J. A duplicative cause of action is inconsistent with the purpose of Regulation J. Therefore, inconsistent provisions of state law are displaced by the preemptive intent of this regulation from furnishing either a contradictory or additional remedy for losses resulting from transactions within the FedWire system.

■ As to duplicative causes of action such as wrongful payment and negligence, the Court finds Regulation J pre-empts those provisions of state law because they do not relate exclusively to "governing funds transfers...." Commentary, 12 C.F.R. § 210.-25(a). Only those provisions of state law which are compatible with Regulation J and are directed solely at "governing funds transfers" are expressly declared free from pre-emption by Regulation J. *Id.*

The Court believes the structure, purpose, and the more plausible inferences to be drawn from the language of Regulation J dictate that those provisions of state law which are compatible with, but do not relate solely to funds transfers, are pre-empted. This is so for the following reasons. Certain causes of action, such as wrongful payment, sweep broadly and cover diverse types of wrongs in various factual circumstances. However, common law remedies are sometimes inadequately refined to provide a suitable legal framework effectively allocating duties, rights, and ultimately liability for highly specialized commercial settings. This

problem is precisely why Regulation J was promulgated. Regulation J governs a highly complicated area of financial dealings and is especially suited to that task.

The Court believes that to conclude Regulation J, which is targeted at an unique area of commercial activity, was intended to coexist with the broad and unfocused common law liability theories would be an implausible inference to draw. To do so, the Court would have to assume that the Federal Reserve Board found common law theories adequately suited to FedWire funds transfers, but still thought it necessary to adopt the technical Regulation J scheme to govern those funds transfers. This would be an odd inference indeed.

■ For the above enumerated reasons, the Court holds that compatible provisions of state law which do not relate exclusively to governing funds transfers are also pre-empted by Regulation J because the only compatible measures which are saved by the text of the Regulation are those which relate to governing funds transfers. All other remedies contravene the structure and purpose of Regulation J and are pre-empted.

### 1) The Negligence Claim

■ The Court will first address the pre-emption of the negligence claim in this case. Regulation J is a detailed, carefully assembled legal regime. It also contains its own built in standards of due care. For example, Regulation J establishes security procedures (§ 4A–201), and a standard of circumstantial reasonableness within a commercial setting (§ 4A–202(c)) which, by and large, determine who will bear the risk of loss for an erroneous payment under § 4A–205.

To interject an alternative standard of due care with its attendant liability from an additional legal source (such as state common law negligence) would necessarily involve either a direct conflict between federal and state standards or useless repetition of identical rules of law arising from state sources. Directly conflicting provisions of state negligence law are expressly pre-empted by the plain language of Regulation J. Compatible aspects of negligence doctrine would be pre-

empted because they do not relate exclusively to governing funds transfers and are thus uselessly repetitive and implicitly pre-empted by Regulation J.

In the case of a conflicting standard between North Carolina common law negligence and the built-in due care standards of Regulation J, the commentary on the regulations and its structure and purpose unambiguously counsel that the common law is pre-empted by the regulation within this very narrow context. In the case of a complete compatibility between Regulation J and North Carolina negligence doctrine, a cause of action brought under both standards would senselessly duplicate liability for the same wrongs under the same theories although the standards of liability issue from different sovereigns.

The Court believes this would be an untenable inference to draw. To do so would require the Court to find that by promulgating Regulation J with congressionally delegated authority, the Federal Reserve Board, and through it, Congress, intended to multiply, duplicate, complicate and exacerbate bank liability from FedWire transfers. The Court thinks it more plausible to conclude that the Federal Reserve Board intended to streamline, unify, simplify and narrow liability exposure for such transactions. The Court will not impute illogic to the Federal Reserve Board by holding that in promulgating Regulation J, it intended to complicate matters for banks or their customers.

### 2) The Wrongful Payment Claim

█ A similar analysis applies to Plaintiff's wrongful payment claim. Inasmuch as that claim is compatible with Regulation J, it is senselessly duplicative, and where it contradicts the remedies afforded by Regulation J, it is expressly pre-empted. Moreover, Regulation J contains its own payment rules. See, §§ 4A–303–401.

Wrongful payment is not a theory of liability directed at governing only funds transfers within the meaning of that phrase under Regulation J. Instead, that common law cause of action covers a broad range of commercial relationships including, inter alia,

those involving funds transfers through the FedWire system.

Based upon the above mentioned aspects of Regulation J's language, structure and purpose, the Court finds there is a "clear manifestation of intention" by a federal regulatory agency to pre-empt state law. New York State Dept. of Social Services v. Dublino, 413 U.S. 405, 417, 93 S.Ct. 2507, 2515, 37 L.Ed.2d 688 (1973); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); Local 926, International Union of Operating Engineers v. Jones, 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983). Consequently, because the Federal Reserve Board, acting under authority delegated by Congress, has "evidence[d] an intent to occupy a given field," and "state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," the Court does not believe that the common law doctrines at issue here can escape the pre-emptive effect of Regulation J. Silkwood, 464 U.S. at 248, 104 S.Ct. at 621 (1984), Jones, 430 U.S. at 524, 97 S.Ct. at 1309.

█ The Court notes that the field of regulation covered by Regulation J is not one entitled to the presumption against pre-emption because it is not one where states have traditionally acted to protect public health or safety. H.P. Welch Co., 306 U.S. 79, 59 S.Ct. 438, 83 L.Ed. 500 (1939). In fact, Regulation J governs the FedWire funds transfer system which Regulation J itself says is "owned and operated by the Federal Reserve Bank...." See, 12 C.F.R. § 210.26(e). Nothing could be less traditionally governed by state law than an instrumentality of a federal regulatory agency.

The Court, therefore, holds that under the Supremacy Clause, Regulation J, within the narrow reaches of FedWire funds transfers, pre-empts all alternative causes of action—including negligence and wrongful payment—that are inconsistent with Regulation J, as well as those consistent with Regulation J and unrelated exclusively to governing funds transfers. Consequently, Plaintiff's claims under counts two and three of the complaint must be dismissed as a matter of law for failure to state a claim upon which

relief can be granted. Fed.R.Civ.P. 12(b)(6) (West 1993).

### III. Summary Judgment and the Regulation J Claim

This motion comes before the Court styled as either a motion to dismiss or one for summary judgment. According to Moore's Federal Practice,

> "It is left to the trial court whether or not to receive matters outside the pleadings on a Rule 12(b)(6) motion. If matters outside the pleadings are received and relied on by the court, the motion must be treated as a motion for summary judgment and the court must notify the parties and otherwise comply with the procedural requirements of Rule 56. 2A Moore's Federal Practice ¶ 12.09[3].

The Court does not believe a hearing is necessary in this case. Both parties to this action have supplied the Court with briefs and affidavits which they intend the Court to rely upon. Additionally, Plaintiff has furnished the Court with a set of Defendant's answers to interrogatories which Plaintiff intends the Court to rely upon. Therefore, the Court concludes both parties consent to the Court treating the instant motion as one for summary judgment under Rule 56.

■■■■■ Federal Rule of Civil Procedure 56(c) provides,

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (West 1993).

Summary judgment must be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id., Barwick v. Celotex Corp.*, 736 F.2d 946, 58 (4th Cir.1984). To attain summary judgment, the movant bears an initial burden of demonstrating no genuine issues of material fact are present. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who must point out specific facts which create

disputed factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion, district courts must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

■■■■ An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds could recognize as real factual disputes." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985).

■■■■ Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence from the entire record could not lead a rational fact finder to rule for the non-moving party. *Matsushita Electric Industrial Co.*, 475 U.S. at 587, 106 S.Ct. at 1356, *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 1356 (1986). Accordingly, "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. That is, " 'in every case, before evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.' " *Id.* at 251, 106 S.Ct. at 2511, *quoting, Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872).

Plaintiff claims it is entitled to recover the disputed funds by virtue of § 4A–207 of Regulation J which provides,

> [I]f in a payment order received by the beneficiary's bank, the name, bank account number or other identification of the beneficiary refers to a nonexistent or unidentifiable person or account, no person has rights as a beneficiary of the order and acceptance of the order cannot occur.

The Court finds that § 4A–207 straightforwardly requires banks to reject funds transfers received through the FedWire system which do not come to them bearing at least one identifiable beneficiary. In order to prevail under Regulation J, Plaintiff must rebut Defendant's claim that STC was clearly designated as a beneficiary of the funds under the circumstances. Plaintiff not only fails to rebut this claim, it admits it.

Plaintiffs first states "'STC DONMAR ...' did not refer to any existing or identifiable company or person." Plaintiff's Brief Opposing Summary Judgment p. 9 ¶ 2. Then, Plaintiff proceeds to say, "Donmar was the originator of these wire transfers, and as the originator, it clearly knew who was the beneficiary of the wires. As stated in Mr. Levinson's Affidavit, STC and Donmar were joint beneficiaries of all wire transfers from Donmar to SNB." *Id.* at ¶ 3 and Plaintiff's brief, p. 1, ¶ 2. Consequently, Plaintiff claims there was no beneficiary identifiable by Defendant, then claims there were at least two beneficiaries identifiable by Plaintiff alone.

The Court finds this is incredible. Plaintiff asks the Court, and eventually would ask a jury, to accept the idea that it sent over one half million dollars by wire encoded with a cryptic message (recommended by Stephen Selleck) designating a beneficiary known only to the sender, and unknowable to anyone else. Yet, Defendant, once it received the funds, acted as though it knew precisely who those funds belonged to. Moreover, the undisputed facts indicate Selleck clearly informed Defendant of the code which would be used in the funds transfer and the beneficiary denoted by that code. Plaintiff does not contend Defendant was not entitled to rely upon Selleck's directions concerning the transfer. Plaintiff's theory would be conceivable if the money was sent accidentally. But the money was not issued by a slip of the transfer button. In fact, Defendant transferred the money using the code Selleck instructed Plaintiff to use, Selleck advised the Defendant to look for that code in connection with a wire of a specified sum, and that code was in fact used. Plaintiff does not dispute this.

Undaunted, Plaintiff argues the disputed funds transfer was wired designating two beneficiaries—Donmar and STC—which Plaintiff says Defendant "chooses to ignore." As previously noted, this necessarily implies there was at least one identifiable beneficiary which is more than adequate under Regulation J. Furthermore, when Plaintiff felt it necessary to correct a typographical error in a previous wire, it corrected SLC to STC, presumably assuming the bank knew who STC was. Assuming there were two beneficiaries denoted on the wire, Regulation J says nothing about refusing funds transfers which designate multiple beneficiaries. It only requires banks to refuse transfers carrying *no* identifiable beneficiaries. The Court finds that the STC/Donmar language identifies the parties to the transaction, effectively naming the transaction the "STC/Donmar transaction," but also makes clear within the context of the transaction that STC was the beneficiary of the money and that Donmar was the payor.

Then, Plaintiff leaps from its dual beneficiary theory, which, incidentally, appears nowhere in Regulation J, to another theory which the Court will call the unauthorized transfer theory. Under the unauthorized transfer theory, Plaintiff contends Defendant wrongfully transferred the funds to another party (Discount Corp. of New York) at the direction of STC without Plaintiff's consent as a dual beneficiary. Plaintiff's Brief at pp. 11, 12. However, this would only matter, if at all, if a bank had some legal duty to obtain consent or even had some idea that it needed the consent of the sender to transfer money already received by a beneficiary. Regulation J does not require this sort of authority.

Then, Plaintiff shifts its argument to § 4A–404(a) of Regulation J which provides

"if a beneficiary's bank accepts a payment order, the bank is obliged to pay the amount of the order to the beneficiary of the order...." Clearly, the bank did this when it credited the money to STC's account. Indeed, that is the very reason for this dispute. This, claims Plaintiff, required Defendant to hold the funds rather than credit them to STC's "sole account" unless Plaintiff "authorized" it. But this is not what the plain wording of § 404(a) requires. Instead, § 404(a) merely requires a receiving bank to pay properly received money to the identifiable beneficiary.

Plaintiff then launches into an argument, relying on an analogy to Article 3 of the Uniform Commercial Code, which maintains that Defendant is liable to Plaintiff for crediting STC's account when it should have credited STC and Donmar, the ostensible joint beneficiaries. The Court does not know how Defendant could have "credited" Plaintiff in a non-existent account with money partially Plaintiff's and partially STC's. Furthermore, the Court hasn't the slightest idea what Article 3 of the UCC has to do with Regulation J, and after having thoroughly searched Regulation J finds not even the slightest reference to UCC Article 3. The Court finds no provision in Regulation J which contemplates a dual beneficiary transaction and doubts whether a dual beneficiary arrangement is possible under Regulation J. The fact that Plaintiff must analogize to Article 3 bespeaks volumes on the absence of a dual beneficiary concept within the language of Regulation J. Therefore, this argument is inapposite and the Court declines the invitation to announce a legal remedy where neither Congress nor a regulatory agency has provided one.

So, in sum, Plaintiff begins by arguing there was no identifiable beneficiary for the March 27, 1991 wire transfer. Then, Plaintiff argues STC and Plaintiff were joint beneficiaries of the transfers, but only Plaintiff knew this. From this, Plaintiff argues analogously that Article 3, nowhere found in Regulation J, entitles it to recover from Defendant because Defendant wrongfully credited only one beneficiary; namely, STC. Because § 4A–404(a) has been fully satisfied, and Article 3 is inapposite, the Court finds that the unauthorized transfer theory must be rejected.

■ The Court finds that § 4A–207 only requires a bank to refuse a payment order when the beneficiary is unidentifiable. A beneficiary can be identified in any number of ways including the plain wording of the transfer order or the circumstances of the transfer. The Court finds under the circumstances of Selleck's having alerted Defendant to expect the money transfer, and the language employed in the transmittal message, Stephen's Trading Co. was clearly an identifiable beneficiary whether measured objectively or subjectively. Plaintiff admits as much by arguing that the money was designated to two beneficiaries. There was admittedly at least one identifiable beneficiary, and since § 4A–207 requires no more, the Defendant was not required to refuse the transfer under § 4A–207. Consequently, the money need not have been returned to the originator (First Union bank acting as the agent of Plaintiff).

The Court finds Plaintiff's dual beneficiary theory, even if relevant under § 4A–207, inapposite. Regulation J defines a beneficiary in a common sense fashion as "the person to be paid by the beneficiary's bank." To accept this dual beneficiary theory would require the Court to accept an implausible scenario in which Plaintiff intended to give Stephen's Trading Co. a sizeable sum of money in exchange for foreign currency and simultaneously intended to transfer that money to itself. Thus, odd as it may seem under Plaintiff's reasoning, one person could enjoy the fortunate position of being both payor and payee. The Court finds this hardly creates issues that "reasonable minds could recognize as real factual disputes." *Ross,* 759 F.2d at 364.

The Court concludes there are no genuine issues of material fact and that there is a failure of proof on an essential element upon which Plaintiff would bear the burden at trial. Namely, Plaintiff has not shown that there was no identifiable beneficiary for the wire transfers. Plaintiff transferred money to Defendant to consummate a financial transaction with Stephen's Trading Co. and

designated STC or Stephen's Trading Co. as the beneficiary of that money. The Defendant received that money and credited it to the intended beneficiary. Regulation J requires no more. Accordingly, Defendant is entitled by Rule 56 to judgment as a matter of law. The Court grants Defendant's motion for summary judgment as to count one of the complaint.

**NOW, THEREFORE, IT IS ORDERED** that:

1) Defendant's motion for summary judgment will be **GRANTED** as to count one of the complaint.

2) Defendant's motion to dismiss will be **GRANTED** as to counts two and three.

3) Defendant's motion for a protective order be, and hereby is, **DENIED** as moot.

A judgment dismissing this action with prejudice will be filed simultaneously with the Memorandum of Decision.

### *JUDGMENT*

THIS MATTER is before the Court on Plaintiff's motion to dismiss or for summary judgment, filed November 2, 1992.

**NOW THEREFORE,** in accordance with the Memorandum of Decision and Order filed simultaneously with this Judgment, **IT IS ORDERED, ADJUDGED, AND DECREED** that:

1. Defendant's motion for summary judgment is **GRANTED as to count one.**

2. Defendant's motion to dismiss is **GRANTED as to counts two and three.**

3. Defendant's motion for a protective order is **DENIED as moot.**

4. Plaintiff shall recover nothing of the Defendant,

5. Plaintiff's action is **DISMISSED WITH PREJUDICE;** and

6. Each party shall bear its own costs.