**DONMAR ENTERPRISES, INCORPORATED, Plaintiff–Appellant,**

v.

**SOUTHERN NATIONAL BANK OF NORTH CAROLINA, Defendant–Appellee,**

and

**Southern International Corporation, Defendant.**

No. 93–2101.

United States Court of Appeals, Fourth Circuit.

Argued March 9, 1994.

Decided Sept. 13, 1995.

**ARGUED:** Robert Spencer Adden, Jr., Ruff, Bond, Cobb, Wade & McNair, Charlotte, NC, for appellant. Josephine Herring Hicks, Parker, Poe, Adams & Bernstein, Charlotte, NC, for appellee. **ON BRIEF:** James O. Cobb, Ruff, Bond, Cobb, Wade & McNair, Charlotte, NC, for appellant. Irvin W. Hankins, III, Parker, Poe, Adams & Bernstein, Charlotte, NC, for appellee.

Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and BRINKEMA, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge WIDENER wrote the opinion in which Chief Judge ERVIN and Judge BRINKEMA concurred.

## OPINION

WIDENER, Circuit Judge:

Donmar Enterprises, Inc. (Donmar) appeals from the district court's grant of sum-

mary judgment to Southern National Bank of North Carolina (Southern National) as to Count I of Donmar's complaint, which was predicated on Federal Reserve Board Regulation J, Subpart B, Appendix B, and dismissal of Counts II and III, which raised negligence and wrongful payment claims under state law. The district court held that a private cause of action can be maintained pursuant to Regulation J, and that Regulation J pre-empted Donmar's state law claims of negligence and wrongful payment. It granted summary judgment to Southern National as to the Regulation J claim since the requirements of Regulation J were satisfied, and along the same line, dismissed the state law counts. See *Donmar Enters., Inc. v. Southern Nat'l Bank*, 828 F.Supp. 1230, 1239 (W.D.N.C.1993). We affirm.

## I.

We recount the facts and inferences in the light most favorable to the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Donmar, located in Florida, engages in the selling of automobile sunroofs and accessories, which involves purchasing inventory from businesses in foreign countries. In making foreign purchases, Donmar pays by converting U.S. currency to foreign currency. For this conversion, Donmar used Stephen's Trading Company (Stephen's), a North Carolina company. After a transaction in which Donmar wired funds directly into Stephen's account at Wachovia Bank in North Carolina, Donmar's president, Kal Levinson, and Stephen Selleck, Stephen's owner and president, agreed that future transfers would be handled through the defendant, Southern National, and that Donmar would be a beneficiary of Donmar's wire transfers to Southern National, which would be sent to Southern National with a Stephen's transaction code. Donmar did not have an account with Southern National, Stephen's did have. Donmar would then fax to Stephen's its authorization for the purchase of foreign currency and where it was to be transferred, and Stephen's would deliver the facsimile from Donmar to Southern National as authorization to transfer the funds. Southern National, however, was not advised

of this agreement. On two occasions in 1990, Donmar caused its bank, First Union of Jacksonville, Florida (First Union) to transmit funds by wire to Southern National. On August 10, 1990, the first wire transfer was sent with the notation "ATTN INT DIV R E STC DONMAR WIRE 102 1003" and, with reference to that August 10th transfer, Stephen's sent Southern National a facsimile message authorizing deposit of the funds into its account. Southern National credited the funds to Stephen's account. Seven days later, at Stephen's direction, Southern National transferred funds to a bank in Great Britain, referencing STC/Donmar No. 102–1003 as the order customer and sent Donmar confirmation of this transaction. This confirmation from Southern National led Donmar to believe that Southern National was acting pursuant to Donmar's authorization facsimile sent to Stephen's. A second similar wire transaction occurred in October of 1990, when Donmar had First Union wire money to Southern National with the notation "ATN INTL DIV REF STC DON MAR WIRE 102 1007," and Southern National, pursuant to instructions received from Stephen's, credited Stephen's account and thereafter transferred funds to Great Britain. However, Selleck does not recall receiving confirmation of this wire transfer.

On February 26, 1991, Donmar authorized First Union to wire transfer $15,000 to Southern National, with the wire noting "ATTN INTL DIV RE STC DONMAR TRANS CODE 1021011," pursuant to instructions from Stephen's to Donmar as to the notation on the wire. This $15,000 was the margin required to hold the purchase of £ 280,000. The supervisor of wire transfers in Southern National's international division, upon receipt of the $15,000 wire transfer, called Selleck of Stephen's to confirm that Stephen's was in fact the intended beneficiary of this wire transfer. Selleck confirmed the wire transfer and instructed the supervisor that it was to be credited to Stephen's account. Pursuant to instructions from Stephen's, Southern National wired this money to a bank in Pennsylvania, to be credited to the account of David A. Selleck.

On March 27, 1991, Stephen's sent a facsimile message to Donmar, requesting that it send "My USD to: Southern National Bank, Lumberton, N.C.... Re: STC/Donmar Trans Code 102–1011." The same day, Stephen's notified Southern National that it was expecting a wire transfer of $524,276.71 from First Union, referenced as "INCOMING WIRE STC/DONMAR CODE 102–1011" and again directed Southern National to deposit funds from the wire transfer into Stephen's account. Subsequently, Donmar authorized First Union to wire the $524,276.71 to Southern National and faxed instructions to Stephen's to wire £ 200,000 to Lloyds Bank in London and to hold or sell the other £ 80,000. First Union transferred the funds to Southern National at 1:39 p.m., with the notation "ATTN INTL DIV REF SLC/DONMAR TRANS CODE 102–1011." Southern National deposited the funds to Stephen's account. Also on March 27th, pursuant to instructions from Stephen's received at 2:32 p.m., Southern National wired $524,000 to Stephen's account at Discount Corp. of New York.[1] On March 28, Stephen's directed Southern National to wire funds in the amount of £ 200,000 to Lloyd's Bank in England, but Southern National informed Stephen's that it lacked sufficient funds to accomplish the transfer. That same day, at 11:38 a.m., Stephen's sent Donmar a facsimile message to the effect that it was unable to complete the international wire for £ 200,000 "[d]ue to capital being held for hedging transactions in Stephen's Trading account," but estimated that the transaction should be completed on April 1, 1991. Shortly thereafter, Levinson of Donmar called First Union and instructed it to contact Southern National and requested that the $524,276.71 wire transfer be returned. At 12:10 p.m. on March 28, Levinson spoke directly with an employee at Southern National and informed her that the wire transfer beneficiary line was addressed RE: STC/DONMAR, but was told that a wire addressed in that manner would not have been accepted by Southern National. At 1:26 p.m. on March 28, South-

ern National received a wire from First Union stating that the SLC referred to in the wire transfer should have been STC, not SLC.[2] On April 3, 1991, Southern National transferred the equivalent of £ 200,000 from Stephen's account to Donmar's British supplier's account at Lloyd's Bank, as directed by Stephen's.

While the foregoing recitation of some relevant facts may seem somewhat complicated, in actuality there is little complication. The unfamiliarity of the terms, we suggest, accounts for any apparent confusion. The following facts also stand out:

Donmar did not have and had never had an account in Southern National.

Donmar had never had an agreement with Southern National.

Donmar had never been a customer of Southern National.

Donmar never gave any direction to Southern National as to the disposition of any of the funds involved in this case until the calls from Levinson to First Union and Southern National on March 28, 1991.

Neither Stephen's nor Donmar gave any direction to Southern National to set up a joint account in their names or payable to their order.

Stephen's directed Donmar to wire the money immediately involved in this case (the $15,000 and $524,726.71) to Southern National, giving a code number to identify the transmission.

Donmar directed First Union to wire that same money involved to Southern National, using the code number given to it by Stephen's.

When the money was received at Southern National in the sum expected and with the same code number, it was deposited in Stephen's account in Southern National, as Stephen's had directed Southern National.

We find that the foregoing facts are not contradicted and support the judgment appealed from. We are of opinion there is no issue of fact in this case.

---

1. This money was sent in two wire transfers at approximately 3:00 p.m.

2. That this was no more than a typographical error is shown by the fact that no claim is made against First Union, hardly an insolvent defendant.

## II.

Donmar claims that it lost $187,276.71 [3] and filed a complaint seeking recovery under three counts, alleging Southern National's violation of Federal Reserve Board Regulation J, 55 Fed.Reg. 40,791 (1990) (as amended Oct. 5, 1990) (codified at 12 C.F.R. Part 210 (Subpart B and Appendix B)); wrongful payment; and negligence. Southern National filed a motion to dismiss or for summary judgment. The district court granted summary judgment to Southern National on the Regulation J claim and dismissed the negligence and wrongful payment claims as being inconsistent with, and therefore pre-empted by, Regulation J.

Donmar raises three issues on appeal. First, Donmar claims that an issue of fact exists as to who was the beneficiary of the wire transfers and argues that both it and Stephen's were joint beneficiaries and that Southern National was obligated, pursuant to Regulation J's adoption of section 4A–404(a) of the U.C.C., to pay them as joint beneficiaries. See Part I, *supra*. Second, Donmar argues that Southern National was required to refuse to accept the wire transfer, since the designation STC/Donmar was an unidentifiable or nonexistent beneficiary under Regulation J's section 4A–207. Third, Donmar argues that the district court erred in determining that Regulation J pre-empted its state law causes of action in this case.

## III.

■ Our review of a summary judgment is *de novo*. *Shaw v. Stroud*, 13 F.3d 791, 798

(4th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994). Since the provisions of Regulation J are applicable to this case, a review of those regulations and the context in which they arose is appropriate. As of January 1, 1991, the Federal Reserve Board revised Subpart B of Regulation J to apply the provisions of U.C.C. Article 4A to funds transfers handled by Federal Reserve banks.[4] The official commentary to the U.C.C. provisions in Regulation J, Subpart B provide that the official comments to U.C.C. Article 4A, while not incorporated in Subpart B or its official commentary, may nonetheless "be useful in interpreting Article 4A."[5] Recently, electronic funds transfers, also known as wire transfers, have become increasingly utilized by businesses and financial institutions to effect payments and transfers of a vast volume of funds.[6] The success of funds transfer systems is predicated on speed, efficiency, high volume, low cost, certainty, and finality.[7] The drafters of the U.C.C. considered these factors in assessing liabilities under Article 4A:

> This system of pricing may not be feasible if the bank is exposed to very large liabilities in connection with the transaction.... A major policy issue in the drafting of Article 4A is that of determining how risk of loss is to be allocated given the price structure in the industry.

U.C.C. § 4A–101, Prefatory Note.

## IV.

■ Donmar contends that Regulation J does not pre-empt its state law negligence

---

3. Presumably, this is the difference between the total amount of the wire transfers of February 26, 1991 and March 27, 1991, less the £ 200,000 wired to England on April 3, 1991. The exact amount of the claim is not otherwise explained. Stephen's and Selleck's absence from the litigation apparently is because they are insolvent.

4. The commentary to Regulation J states: "Subpart B of this part incorporates the provisions of Article 4A set forth in appendix B of this subpart." Appendix A to Subpart B—Commentary to Regulation J (12 C.F.R. Part 210) at (b)(1).

5. Appendix A to Subpart B—Commentary to Regulation J (12 C.F.R. Part 210) at (b)(1).

6. Funds transfers utilize two principal wire systems: the Federal Reserve Wire Transfer Network (Fedwire), owned and operated by the Federal Reserve Bank, and the Clearing House Interbank Payment System (CHIPS), owned and operated by the New York Clearing House Association. The volume of payments by wire transfer over these two principal wire payment systems exceeds one trillion dollars per day. See U.C.C., Article 4A, Prefatory Note; § 4A–101, 55 Fed. Reg. 40,791 (Oct. 5, 1990).

7. See *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189, 195 (N.Y.1991).

and wrongful payment claims and that the district court erred in dismissing these causes of action. In considering the preemptive effect of federal law, including federal regulations, we first look to the regulation to determine the expressed pre-emptive intent of the Federal Reserve Board.[8] Regulation J itself contains a preemption standard:

> [R]egulations of the Board may pre-empt inconsistent provisions of state law. Accordingly, subpart B of this part supersedes or pre-empts inconsistent provisions of state law. It does not affect state law governing funds transfers that does not conflict with the provisions of subpart B of this part, such as Article 4A, as enacted in any state, as it applies to parties to funds transfers through Fedwire whose rights are not governed by subpart B of this part.

Appendix A to Subpart B to Part 210, 12 C.F.R. § 210.25 (1995). This regulation specifies that inconsistent provisions of state law are pre-empted, while state law that does not conflict is not pre-empted, and lists as an example of a non-conflicting state law, a state law governing funds transfers that applies to parties to which the federal Article 4A does not apply. But Article 4A applies in this case.

 The Official Commentary to U.C.C. section 4A–102 provides insight as to the objectives of the Federal Reserve Board in adopting Article 4A:

> Before this Article was drafted there was no comprehensive body of law—statutory or judicial—that defined the judicial nature of a funds transfer or the rights and obligations flowing from payment orders. Judicial authority with respect to funds transfers is sparse, undeveloped and not uniform. Judges have had to resolve disputes by referring to general principles of common law or equity ... [b]ut attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory.... The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

It is apparent from the U.C.C. commentary that a uniform and comprehensive national regulation of Fedwire transfers was the goal of the Board in adopting Article 4A.[9] Furthermore, the Board has made clear that the type of state laws it considers not in conflict with Subpart B are state laws specifically governing funds transfers and parties not subject to Subpart B. Because we conclude in Part V that Southern National complied with and therefore has no liability under Subpart B, any liability founded on state law of negligence or wrongful payment would necessarily be in conflict with the federal regulations and is pre-empted. See *Worm v.*

---

8. See *CSX Transp. v. Easterwood,* —— U.S. ——, ——, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) ("If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent"). "Federal regulations have no less preemptive effect than federal statutes" and where Congress has delegated discretion to an agency, the proper question regarding the pre-emptive scope of a regulation is whether the agency meant to pre-empt the state law, and whether the pre-emption is "unreasonable, unauthorized, and inconsistent under the underlying statute." *Fidelity Fed. Sav. and Loan Ass'n. v. de la Cuesta,* 458 U.S. 141, 153–154, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982). The Federal Reserve Board of Governors, of course, has statutory authority to promulgate regulations. 12 U.S.C. § 248(i). There is no question raised but that the regulation involved in this case was reasonable, authorized, and consistent with the underlying statute.

9. See 55 Fed.Reg. 40,791 (Oct. 5, 1990), wherein the Board states that "the adoption of these rules as federal law is necessary, in light of the national scope of the Fedwire system" and "is necessary to ensure that the law applicable to funds transfers involving Federal Reserve Banks is uniform for all Fedwire funds transfers, regardless of the location of the banks involved in the funds transfer."

**950**

*American Cyanamid Co.*, 5 F.3d 744, 748 (4th Cir.1993).

Accordingly, we hold that any state causes of action based on negligence or unlawful payment on the facts of this case are preempted by Regulation J.

**V.**

■ Donmar argues that the notation STC DONMAR TRANS CODE 1021011 on its wire transfer dated February 26, 1991 and the notation SLC/DONMAR TRANS CODE 102–1011 on its wire transfer dated March 27, 1991 indicate that STC and Donmar were joint beneficiaries of the transfer. Therefore, Donmar claims that Southern National violated section 4A–404(a) by crediting the funds to Stephen's only. Section 4A–404(a) of Regulation J provides in relevant part:

> [I]f a beneficiary's bank accepts a payment order, the bank is obliged to pay the amount of the order to the beneficiary of the order....

In support of its contention that an issue of fact exists as to whether Donmar was a beneficiary of the transfer and that Southern National violated this section, Donmar relies upon the affidavit of Levinson to the effect that it was his intention, by putting Donmar's name on what he refers to as the "beneficiary line" of the wire transfer, that Donmar be a joint beneficiary, along with Stephen's, of the transfer.[10] However, Donmar submits no evidence that this cryptic reference would render Donmar a joint beneficiary of the transfer. Donmar merely states that the notations in question appeared on what Donmar calls the "beneficiary line" of the wire transfer. Donmar points to no authority or evidence of common usage within the industry to support its interpretation of the transfer order and its claimed joint beneficiary status, and we fail to see how Donmar's

construction of the message can be justified, in light of the facts of this case and the Fedwire format and funds transfer practice. The format used for Fedwire has no separately designated fields for data about the originator or beneficiary of a transfer, *Fed to Expand Fedwire Format to Oblige New Wire Regs,* Money Laundering Alert, Dec. 1993, at 6, and "does not provide sufficient space for complete originator and beneficiary information," Amy G. Rudnick and Julie A. Stanton, *Treasury and Fed Are Fashioning New Wire Transfer Rules,* Banking Policy Report, Oct. 4, 1993 at 11. While Fedwire limits remittance information to approximately 250 characters,[11] the Federal Reserve Board has issued a policy statement encouraging financial institutions to include information on senders as well as beneficiaries on wire transfers,[12] and has proposed regulations that mandate that information.[13] Considering this and especially in view of the complete lack of direction by Donmar to Southern National; the specific direction of Stephen's to Southern National; and Donmar's following of Stephen's directions as to the transfer, even to the code number, the only reasonable conclusion is that Southern National was justified in not considering the notation STC Donmar or STC/Donmar as designating Stephen's and Donmar as joint beneficiaries, as argued by Donmar. In sum, there is no evidence that Southern National was ever advised prior March 28, 1991, that Donmar advised that it and Stephen's were joint beneficiaries of the wire transfers; rather, the inferences from the evidence are to the contrary.

We further think that Southern National correctly identified the beneficiary of the wire transfers from First Union as Stephen's and are thus of opinion that Southern National was entitled to summary judgment on Donmar's Regulation J claims predicated on

---

**10.** So far as the opinion of the district court may be read as holding that a joint account may not be created under Regulation J, we need not, and do not, decide that question. Since we decide that neither Stephen's nor Donmar directed Southern National to hold the funds involved in a joint account, we express no opinion as to any consequence had either or both of them so directed.

**11.** Richard Bort, *Ax falls on paper as electronic payments hone sharper edge,* Corporate Cashflow Magazine, Mar., 1993 at 24.

**12.** See *Fed Issues Money Laundering Policy Statement for Large–Value Transfers,* BNA Banking Daily, Dec. 31, 1992.

**13.** See 58 Fed.Reg. 46,014 (Aug. 31, 1993).

alleged violations of sections 4A–404(a) and 4A–207.[14]

The judgment of the district court is accordingly

*AFFIRMED.*

14. § 4A–207(a), regarding misdescription of beneficiary, provides, in part:
 if, in a payment order received by the beneficiary's bank, the name, bank account number, or other identification of the beneficiary refers to a nonexistent or unidentifiable person or account, no person has rights as a beneficiary of the order and acceptance of the order cannot occur.