**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-2218**

BLUE FLAME MEDICAL LLC,

Plaintiff – Appellant,

v.

CHAIN BRIDGE BANK, N.A.,

Defendant and Third-Party Plaintiff – Appellee,

JOHN J. BROUGH; DAVID M. EVINGER,

Defendants – Appellees,

v.

JPMORGAN CHASE BANK, N.A.,

Third-Party Defendant.

**No. 21-2219**

BLUE FLAME MEDICAL LLC,

Plaintiff,

v.

CHAIN BRIDGE BANK, N.A.,

Defendant and Third-Party Plaintiff – Appellee,

JOHN J. BROUGH; DAVID M. EVINGER,

        Defendants,

      v.

JPMORGAN CHASE BANK, N.A.,

        Third-Party Defendant – Appellant.

--------

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:20-cv-00658-LMB-IDD)

--------

Argued:  October 27, 2022                                    Decided:  March 20, 2023

--------

Before AGEE and HARRIS, Circuit Judges, and Lydia K. GRIGGSBY, United States District Judge for the District of Maryland, sitting by designation.

--------

Affirmed by unpublished opinion.  Judge Griggsby wrote the opinion, in which Judge Agee and Judge Harris joined.

--------

**ARGUED:** Eric Franklin Citron, GOLDSTEIN & RUSSELL, P.C., Bethesda, Maryland; Alan E. Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, for Appellants.  Gary Andrew Orseck, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Washington, D.C., for Appellee.  **ON BRIEF:** Albinas J. Prizgintas, Washington, D.C., Margarita Botero, Denver, Colorado, Marissa W. Medine, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, for Appellant JPMorgan Chase Bank, N.A.  Kathleen Foley, GOLDSTEIN & RUSSELL, P.C., Bethesda, Maryland, for Appellant Blue Flame Medical LLC.  Matthew M. Madden, Donald Burke, ROBBINS, RUSSELL, ENGLERT, ORSECK, & UNTEREINER LLP, Washington, D.C., for Appellees.

--------

Unpublished opinions are not binding precedent in this circuit.

2

GRIGGSBY, United States District Judge for the District of Maryland, sitting by designation:

This appeal involves the collapse of an agreement to obtain face masks for the State of California during the early days of the COVID-19 pandemic. Defendant and Third-Party Plaintiff-Appellee Chain Bridge Bank ("Chain Bridge") withheld and returned certain funds wired to the bank account of Plaintiff-Appellant Blue Flame Medical LLC ("Blue Flame") in order to purchase face masks for shipment under its contract with California. Thereafter, Blue Flame filed a complaint asserting violations of U.C.C. §§ 4A-204(a) and 4A-404 against Chain Bridge, and state law claims for tortious interference with a contract, tortious interference with a business expectancy, conversion, fraud, constructive fraud, negligence, defamation and breach of contract against Chain Bridge and its President, David M. Evinger ("Evinger"), and Chief Executive Officer, John J. Brough ("Brough") (collectively, "Defendants"). JA19-53. Chain Bridge then filed a third-party complaint against California's bank, Third Party Defendant-Appellant, JPMorgan Chase Bank, N.A. ("JPMorgan"), asserting claims for indemnification under U.C.C. § 4A-211(f) and for unjust enrichment. JA113-22.

The district court dismissed five of Blue Flame's state law claims on preemption grounds. JA54; JA61. After the parties filed cross-motions for summary judgment on the remaining claims, the district court entered summary judgment in Defendants' favor on each of Blue Flame's remaining claims and entered summary judgment in favor of Chain Bridge on its claim for indemnification from JPMorgan. JA3066-3099. The district court held that: (1) Blue Flame's U.C.C. § 4A-404(a) claim failed as a matter of law, because

3

Blue Flame could not establish that it sustained any damage from the return of California's funds; (2) Blue Flame's U.C.C. § 4A-204(a) claim also failed as a matter of law, because that statute is not applicable to the payment order that Chain Bridge generated to facilitate the return of California's funds; (3) Blue Flame's claims for tortious interference with the contract and with business expectancy also failed as a matter of law, because Blue Flame did not proffer any evidence of damage resulting from the return of California's funds; (4) Blue Flame's defamation claim similarly failed as a matter of law, because there is no evidence in the record to show that Defendants made any false statements about Blue Flame or its principals; and (5) the undisputed material facts established JPMorgan's liability to indemnify Chain Bridge under U.C.C. § 4A-211(f) for the loss and expenses resulting from the cancellation of the payment order wiring California's funds to Blue Flame.  JA3083-96.

We agree with the district court that Blue Flame's U.C.C. § 4A-204(a) claim fails as a matter of law, because that provision is not applicable to the payment order that Chain Bridge generated for the return of California's funds.  In addition, we agree with the district court that Blue Flame's U.C.C. § 4A-404(a) claim fails as a matter of law, because Blue Flame cannot establish that it sustained any damage from the return of California's funds and that Blue Flame's claims for tortious interference also fail as a matter of law, because Blue Flame did not establish a valid contract with California.  We also agree with the district court that the undisputed material facts of this case establish JPMorgan's liability to indemnify Chain Bridge under U.C.C. § 4A-211(f) for its loss and expenses resulting from the cancellation of the payment order wiring California's funds to Blue Flame.

For the reasons below, we affirm.

I.

Blue Flame's principals, John Thomas ("Thomas") and Mike Gula ("Gula"), are political consultants. JA3067. When the COVID-19 pandemic began in late 2019, neither Thomas nor Gula had "any experience in the field of medical supplies," the "healthcare industry," or "supply chain management." JA3067; JA527. Nevertheless, in February 2020, Thomas and Gula decided to turn their attention to "connecting . . . medical supply companies with buyers." JA2496. To that end, on March 23, 2020, they formed Blue Flame. JA576.

Three days before Blue Flame's certificate of formation was filed, an acquaintance of Thomas contacted California's State Controller, Betty Yee, on Thomas' behalf, about California's interest in purchasing face masks from Thomas and Gula. JA660-61. Through Yee, Thomas and Gula were put in touch with California's Department of General Services ("DOS"), the entity responsible for contracting with vendors for supplies. JA639-654.

In anticipation of receiving a purchase order from California for the purchase of face masks, Gula went to the McLean, Virginia office of Chain Bridge to open a bank account for Blue Flame on March 23, 2020. JA3070. Based on the forms Gula completed, Chain Bridge opened an account in Blue Flame's name and provided Gula with instructions for wiring funds to the account. JA95-112.

On March 25, 2020, two days after Blue Flame's formation, DOS issued Blue Flame a purchase order for 100 million N95 face masks, in four specified models, for a total price

5

of $609,161,000.00, 75% of which was required to be pre-paid to Blue Flame. JA578-581. The purchase order includes a provision allowing California to "terminate performance of work under this Contract for its convenience . . . if [DOS] determines that a termination is in the State's interest." JA1165; JA3068. The purchase order also includes an initial delivery date of April 3, 2020 for the masks. JA3068.

At approximately 3:30 PM on March 25, 2020, Gula called Chain Bridge's Senior Vice President and Branch Manager, Heather Schoeppe ("Schoeppe"), to inform her that "the state of California is sending an unbelievably large wire transfer in the amount of $450 million." JA3070; JA139-40. The record shows that the anticipated wire transfer into Blue Flame's account raised concerns within Chain Bridge. JA3070.

After her conversation with Gula, Schoeppe called Chain Bridge's Chief Financial Officer, Joanna Williamson ("Williamson"), to ask whether it would be feasible to accept a wire transfer for $450 million. JA1836; JA3071. Williamson acknowledged that it was a large sum, but told Schoeppe "we'll do whatever we need to do" to accommodate it. JA3071. Williamson also told Schoeppe that a deposit of that size would affect the bank's balance sheet and "capital ratios," but without more analysis, or more information about how long the funds would remain in the account, she was not sure whether the impact would be negative. *Id.*

On March 26, 2020, at 11:21 AM ET, a representative from the California State Treasurer's Office originated a wire transfer in the amount of $456,888,600 for Blue Flame's benefit through California's bank, JPMorgan. JA140; JA3073. The outgoing wire transfer triggered an alert in JPMorgan's "roll payment guardian application," which

6

screens for suspicious transaction activity. JA920. An agent for JPMorgan contacted California to verify approval for the wire transfer, which California confirmed. *Id*.

The timeline for what occurred next is central to the parties' dispute in this appeal. At 11:55 AM on March 26, 2020, Chain Bridge received the incoming wire transfer, which was credited to Blue Flame's account. JA936-37. At 11:57 AM, Gula received an automated "Incoming Wire Confirmation" informing him that $456,888,600.00 had been received on Blue Flame's behalf. JA944-45.

Because officials at Chain Bridge remained concerned about the transaction, Evinger ordered that a hold be placed on the funds at 12:07 PM. JA1016-17. JPMorgan also had concerns about the wire transfer. As a result, JPMorgan's Executive Director, Rakesh Korpal ("Korpal") asked his colleague Tim Coffey ("Coffey") "to call Chain Bridge Bank to determine if they knew the beneficiary of the funds and what the disposition of the transactions or the funds were at that point." JA925.

Coffey called Chain Bridge at approximately 12:30 PM and asked to speak to someone in either the wire transfer or fraud departments, relaying that JPMorgan had "concerns of fraud" related to the Blue Flame transaction. JA1023; JA3074. At 12:44 PM, Korpal also called Chain Bridge and spoke with Brough and Evinger, explaining JPMorgan's concern that the "amount seems to be quite high for the supplies that they're purportedly paying for." JA1047; JA3074.

Chain Bridge and JPMorgan also consulted with California about the wire transfer. At 12:51 PM, Fee Chang ("Chang"), an employee of DOS called Chain Bridge and "confirm[ed]" that the wire transfer was "legitimate." JA1048; JA3075. At 12:55 PM,

7

Brough and Evinger called Chang to ask for "documentation to support . . . that funds were transferred properly." JA1049; JA3075. Chang replied that the funds had been transferred by the California State Treasurer's Office, and she referred Brough and Evinger to Natalie Gonzalez, whom Chang stated was "in charge of the transfers." *Id*. At 1:19 PM, Natalie Gonzalez and Mark Hariri of the California State Treasurer's Office called Brough and Evinger to discuss the transfer of funds to Blue Flame's account. JA1054; JA3075.

Shortly thereafter, at 1:34 PM, Brough and Evinger again spoke with Korpal. JA1062; JA3076. During this call, Evinger asked: "Is there any way for JPMorgan to issue a recall for the wire, so that while you intervene in this you have the funds and feel more comfortable?" *Id.* Korpal responded:

> Well, I feel comfortable that you're holding the money right now. I can issue a recall. But I don't think you and I want to get onto the front page of the *Wall Street Journal,* especially if this is a legitimate transaction.

*Id*. Korpal instead asked for "a few more minutes" to determine a course of action. *Id*.

Minutes later, at 1:37 PM, Coffey called Evinger and Brough to explain:

> We're going to be recalling those funds, OK? We have enough concerns that we feel we need to call those funds back. Do you need a recall message from us, or what are you looking for from us?

JA1063; JA3076. In response, Chain Bridge asked for an official communication from JPMorgan, over the Fedline platform, requesting a recall of the funds. *Id*.

At 2:05 PM, JPMorgan sent a message to Chain Bridge *via* the Fedwire Funds Processor ("Fedwire") officially asking for the return of California's funds. JA1064-65; JA3077. At 3:21 PM, Chain Bridge returned the funds to JPMorgan, noting in the accompanying Fedwire message that the action was taken "PER YOUR REQUEST."

8

JA1075-76; JA3077. The funds were posted to California's JPMorgan account by 4:02 PM. JA142; JA3077.

Sometime after JPMorgan requested the return of the funds, but before California learned the funds had already been returned, California also "requested the funds be recalled." JA916. Once the funds were back with California, a DOS employee emailed various California employees, stating, "Funds are with [the State Treasurer's Office]. After further discussion we won't be moving forward with the vendor." JA1079.

Thereafter, Blue Flame tried to continue its negotiations with California. JA3078. But California's DOS representative declined to enter into a new agreement with Blue Flame and began forwarding all Blue Flame correspondence to the Federal Bureau of Investigation.[1] JA2712-14. Although California never explicitly canceled the purchase order, Gula stated that it "was clear" that the "deal was canceled by [California's] actions." JA561.

Following the termination of its purchase order with California, Blue Flame filed a complaint in the United States District Court for the Eastern District of Virginia asserting

---

[1] On April 8, 2021, Congressional Representative Katie Porter of the 45th District of California wrote to the Principal Deputy Inspector General of the Department of Health and Human Services about concerns of "potential price gouging regarding personal protective equipment during the COVID pandemic," identifying Blue Flame as a "potentially costly and burdensome middleman." JA36; JA3078. Blue Flame subsequently provided a response to congressional investigators that included a list of all contracts, orders, or agreements that Blue Flame entered into with federal, state, or local governments or governmental entities, for medical supplies or equipment. JA1119-29. This list shows that, of the 24 entities identified by Blue Flame, the company only filled two orders. *Id.*

claims under U.C.C. §§ 4A-204(a) and 4A-404 against Chain Bridge, and various state law claims against Chain Bridge, Evinger and Brough. JA19-53. The district court dismissed Blue Flame's state law claims for conversion, fraud, constructive fraud, negligence and breach of contract on federal law preemption grounds. JA54.

After Chain Bridge filed a third-party complaint against JPMorgan, asserting claims for indemnification under U.C.C. § 4A-211(f) and for unjust enrichment, all parties filed cross-motions for summary judgment. JA113-21. The district court entered summary judgment in Defendants' favor on each of Blue Flame's remaining claims and entered summary judgment in favor of Chain Bridge on its § 4A-211(f) claim for indemnification from JPMorgan. JA3066-103.

The district court concluded with regard to Blue Flame's U.C.C. § 4A-404(a) claim, that any fraud by Blue Flame in the underlying transaction with California was not the sort of mistake that would make JPMorgan's cancellation effective under U.C.C. § 4A-211(c). JA3082-83. Nonetheless, the district court held that Blue Flame's U.C.C. § 4A-404(a) claim failed as a matter of law, because Blue Flame could not "establish that it sustained any damage" from the return of California's funds. JA3083.

The district court also held that U.C.C. § 4A-204(a) is not applicable to the payment order that Chain Bridge generated to facilitate the return of California's funds to JPMorgan, because this payment order was "issued" by Chain Bridge, rather than "accepted" by Chain Bridge. JA3089. The district court further held that Blue Flame's tortious interference claims failed as a matter of law, because Blue Flame did not proffer evidence of any damage resulting from the return of California's funds. JA3090. Blue Flame's defamation claim

10

also failed as a matter of law, because the district court found that there is no evidence in the record to show that Defendants made any false statements about Blue Flame or its principals.  JA3090-91.

As a final matter, the district court held that there was "no evidence in the record of a communication between Chain Bridge and JPMorgan indicating an agreement to displace the default rule of automatic indemnity" under U.C.C. § 4A-211(f).  JA3095.  Accordingly, the district court concluded that the undisputed material facts established JPMorgan's liability to indemnify Chain Bridge under U.C.C. § 4A-211(f).  JA3092-96.

Blue Flame and JPMorgan each filed timely notices of appeal.

On appeal, Blue Flame raises three challenges to the district court's decision.  First, Blue Flame challenges the district court's decision that U.C.C. § 4A-204(a) imposes no liability on Chain Bridge for withholding and returning California's funds to JPMorgan.  Second, Blue Flame challenges the district court's decision that its state law claims are preempted, insofar as these claims were directed at Chain Bridge's alleged falsification of the payment order generated to return California's funds.  Third, Blue Flame argues that the district court erred in entering summary judgment on its U.C.C. § 4A-404(a) and tortious interference claims and finding that it suffered no damage from Chain Bridge's conduct.  For its part, JPMorgan challenges the district court's determination that Chain Bridge is entitled to indemnification under § 4A-211(f).

II.

This Court reviews the district court's grant of summary judgment *de novo*.  *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012).  The

11

Court asks whether, considering the record adduced by the parties in the district court, "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The district court's dismissal of Blue Flame's state law claims is also reviewed *de novo*. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

III.

A.

We agree with the district court that Blue Flame cannot prevail on its U.C.C. § 4A-204(a) claim against Chain Bridge. In Count II of the complaint, Blue Flame asserts a claim under that statute related to Chain Bridge's decision to return California's funds to JPMorgan. This provision provides, in relevant part, that:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer under section 4A-202, or (ii) not enforceable, in whole or in part, against the customer under section 4A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

U.C.C. § 4A-204(a).

To prevail on its U.C.C. § 4A-204(a) claim, Blue Flame must show that Chain Bridge, in the capacity of a receiving bank, accepted a payment order issued in Blue

12

Flame's name as sender, to return California's funds. We agree with the district court that Blue Flame cannot make this showing for several reasons.

First, the record shows that the payment order generated to return California's funds was issued—rather than accepted—by Chain Bridge, at the request of JPMorgan. This payment order states that Chain Bridge is returning California's funds pursuant to JPMorgan's request. JA2214 (Chain Bridge's Fedwire message to JPMorgan stating that the action was taken "PER YOUR REQUEST."). The record also makes clear that JPMorgan is identified as the "receiving bank" for this payment order. JA2216. Given this, the undisputed evidence in the record shows that Chain Bridge did not accept the payment order generated to return California's funds in the capacity of a receiving bank.

Second, the undisputed record evidence makes clear that the payment order returning California's funds was not issued in the name of Blue Flame as sender. Rather, the record evidence shows that Blue Flame is identified as the "originator" of the funds transfer for this payment order. JA2216.[2]

---

[2] Blue Flame argues that § 4A-204(a) applies even though the purchase order does not list Blue Flame as the sender, because Chain Bridge purported to accept a payment order naming it as the original sender of the funds transfer when the bank issued the payment order to JPMorgan and debited California's funds from its account. Blue Flame asserts that a funds transfer requires two payment orders—one from the customer to its bank ordering a payment and a second from the customer's bank to the beneficiary actually sending the money. So, when Chain Bridge issued a payment order to JPMorgan's bank it was necessarily purporting to accept a payment order from Blue Flame and was fulfilling its duty to issue the second. This argument is without merit. What occurred here was not a funds transfer, but a cancellation, albeit an ineffective one. A cancellation does not require two payment orders, only "a communication of the sender of a payment order cancelling or amending the order . . . transmitted to the receiving bank . . . and the receiving bank's "agree[ment] to the cancellation of amendment." U.C.C. § 4A-211(a). Chain (Continued)

Given this, we agree with the district court that the undisputed record evidence shows that Chain Bridge did not accept the payment order returning California's funds in the capacity of a receiving bank, and that this payment order was not issued in the name of Blue Flame as sender. Accordingly, we affirm the district court's decision to grant summary judgment in Defendants' favor on Blue Flame's U.C.C. § 4A-204(a) claim.

## B.

We also agree with the district court that Blue Flame's state law claims for conversion, fraud, constructive fraud, negligence and breach of contract are preempted by Article 4A of the Uniform Commercial Code ("Article 4A"). In Counts III, VI, VII, VIII, and X of the complaint, Blue Flame asserts that these state law claims against Chain Bridge relate to the return of California's funds to JPMorgan *via* Fedwire. JA43 (alleging that Defendants had no legal justification to remove funds wired by California from Blue Flame's account); JA47-52 (alleging that Defendants decided to undo the transaction and closed Blue Flame's account without reason and the bank had no right to return funds paid to Blue Flame). The district court appropriately dismissed these claims, because they are foreclosed by the "strong doctrine of preemption" for "state causes of action that essentially overlap or dovetail" with the provisions of Article 4A. JA60.

---

Bridge did not purport to fulfill a payment order from Blue Flame but complied with JPMorgan's refund request. To hold otherwise would mean that a bank violates U.C.C. § 4A-204(a) every time it complies with a cancellation and that cannot be true. Section 4A-204(a) is simply inapplicable to this situation.

14

The Federal Reserve Act gives the Board of Governors of the Federal Reserve System ("the Federal Reserve") the authority to promulgate "regulations governing the transfer of funds and charges . . . among Federal reserve banks and their branches."  12 U.S.C. § 248-1; *see also id.* § 248(i) (allowing the Federal Reserve to make "all rules and regulations necessary to enable" it to effectively perform its duty to safeguard Federal Reserve money).  Pursuant to that authority, the Federal Reserve promulgated Regulation J Subpart B to "govern funds transfers through the Fedwire Funds Service."  12 C.F.R. § 210.25(a).  Subpart B expressly incorporates the provisions of Article 4A, which similarly governs funds transfers.  *Id.*  In addition, the Federal Reserve's official commentary to Subpart B addresses preemption and provides, in relevant part, that:

> [R]egulations of the Board may preempt inconsistent provisions of state law. Accordingly, subpart B of this part supersedes or preempts inconsistent provisions of state law.  It does not affect state law governing funds transfers that does not conflict with the provisions of subpart B of this part, such as Article 4A as enacted in any state, as such state law may apply to parties to funds transfers through the Fedwire Funds Service whose rights and obligations are not governed by subpart B of this part.

12 C.F.R. pt. 210, subpt. B, app. A, cmt. to § 210.25.

We held in *Donmar Enterprises, Inc. v. Southern National Bank of North Carolina,* that Regulation J preempts any state law cause of action premised on conduct falling within the scope of Subpart B, whether the state law conflicts with, or is duplicative of, Subpart B.  64 F.3d 944, 949–50 (4th Cir. 1995).  In *Eisenberg v. Wachovia Bank, N.A.*, we also held that determining if a state law claim is preempted by Regulation J turns on whether the challenged conduct in the state law claim would also be covered under Subpart B.  301 F.3d 220, 223 (4th Cir. 2002).

15

The challenged conduct that gives rise to Blue Flame's state law claims here falls within the scope of Article 4A and, therefore, Subpart B. Blue Flame challenges Defendants' decision to return California's funds to JPMorgan *via* Fedwire—specifically alleging that Defendants had no right to "undo the transaction," JA48, "remove the funds," JA44, and "return the funds," JA52, and contesting their failure to "process the wire transfer," JA50. But U.C.C. § 4A-211 governs the cancellation or amendment of payment orders, and explains what is necessary for a cancellation to be "effective." U.C.C. § 4A-211. U.C.C. § 4A-404 also addresses the obligation of the beneficiary's bank to pay the beneficiary once the bank accepts a payment order on the beneficiary's behalf. As we discuss below, this statute also provides a remedy—consequential damages—if the bank refuses to pay the beneficiary, absent effective cancellation. U.C.C. § 4A-404(a). These provisions directly cover Chain Bridge's decision to withhold and return California's funds *via* Fedwire pursuant to JPMorgan's refund request. In fact, as will also be discussed below, the district court concluded that JPMorgan's refund request was not an effective cancellation and Chain Bridge, therefore violated § 4A-404(a), by failing to pay Blue Flame, confirming our conclusion this statute envelops the challenged conduct.

Accordingly, we agree with the district court that Blue Flame's state law claims for conversion, fraud, constructive fraud, negligence and breach of contract relate to conduct that falls within the scope of Subpart B, and we affirm the district court's holding that these claims are, therefore, preempted. *Eisenberg*, 301 F.3d at 223; *see also* U.C.C. § 4A-102 cmt. (Article 4A preempts other law "in any situation covered by [its] particular provisions").

16

C.

We also agree with the district court that Blue Flame has not established damages to support its U.C.C. § 4A-404(a) claim, because the record evidence shows that California would have canceled its contract with Blue Flame even if its funds had not been returned to JPMorgan *via* the Fedwire transfer.

The district court concluded that, although Chain Bridge violated § 4A-404(a) by returning California's funds to JPMorgan, Blue Flame could not establish that it sustained any damages from the return of these funds. JA3083. The district court reached this conclusion for two independent reasons.

First, the district court found that the evidence showed that California would have ended its relationship with Blue Flame even if Chain Bridge had released the funds, because Blue Flame could not fulfill the contract. JA3083-84. Second, the district court also found that there was no evidence in the record that Blue Flame would have successfully fulfilled California's order, even if Blue Flame had received the funds. JA3085. Because we agree that the record evidence shows that California would have canceled its contract with Blue Flame, even if its funds had not been returned, we affirm the district court's grant of summary judgment on this claim.

We first observe that California had the right to terminate its contract with Blue Flame for convenience. The record shows that California's purchase order with Blue Flame allows the State to terminate the order "for its convenience," if termination is "in the State's interest." JA1165. The purchase order also requires that, upon notice of termination, Blue Flame must stop work on the order. JA1165.

17

The record evidence also shows that, once California officials became aware of Blue Flame's origins, California immediately asked for its funds back. Notably, the record shows that almost immediately after the wire transfer was sent to Chain Bridge, JPMorgan reached out to California officials to inform them of Blue Flame's new creation and lack of experience. JA920. Chain Bridge had a similar conversation with California officials within an hour of receiving the wire transfer. JA1048-49; JA1054. The record also shows that JPMorgan initiated a fraud investigation regarding the wire transfer and that Chain Bridge promptly put a hold on the wired funds upon receipt. JA920; JA1016. Shortly thereafter, Chain Bridge returned California's funds to JPMorgan. JA1075-76.

The record evidence also makes clear that California did not intend to proceed with its contract with Blue Flame. After learning of Blue Flame's origins, California promptly "requested the funds be recalled," without knowing that JPMorgan had already received its funds back. JA0916; JA1079. The record also shows that, on the same day that California's funds were returned to JPMorgan, a California Department of General Services employee sent an email to multiple California employees stating that: "Funds are with [the State Treasurer's Office]. After further discussion we won't be moving forward with the vendor." JA1079. While California never explicitly canceled the purchase order with Blue Flame, Mike Gula testified that it "was clear" that the "deal was canceled by [California's] actions." JA0561. This testimony is substantiated by other evidence in the record showing that, following the return of its funds, California declined Blue Flame's further attempts at negotiation and sent Blue Flame's correspondence to the FBI. JA2712-

18

14. Given this, the record evidence shows that California would have terminated its contract with Blue Flame before Blue Flame could have filled any orders for face masks.

Lastly, the record evidence also makes clear that California would have requested the return of its funds before the funds would have been released to Blue Flame. Chain Bridge's CEO, John J. Brough, testified that Chain Bridge had an internal policy for new customer accounts that allowed it to hold funds transfers for one day after receipt. JA188. Pursuant to this policy, Chain Bridge would have held California's funds until the next day, if the bank had not returned the funds to JPMorgan.[3] JA191-92. As discussed above, the record evidence makes clear that, within this time frame, California would have requested the return of its funds and decided not to move forward with its contract with Blue Flame. JA916; JA1079. Accordingly, Blue Flame would not have had the opportunity to fill any part of California's order, because California would have canceled the contract and Blue Flame would have been required to immediately stop work on the purchase order pursuant to the contract's terms. JA1165.

Because the evidence shows that California would have ended its relationship with Blue Flame, even if Chain Bridge had released its funds, we affirm the district court's decision that Blue Flame cannot establish damages for its U.C.C. § 4A-404(a) claim.[4]

---

[3] At his deposition, Chain Bridge's CEO, John J. Brough, testified that Chain Bridge would have held the relevant funds until the next day regardless of JPMorgan's recall, pursuant to the bank's policy. JA191-92.

[4] Blue Flame argues that the district court prematurely granted summary judgment on its damages claim, because there is a genuine issue of material fact in dispute regarding whether it could have completed the purchase order with California. Appellant's Br. at 49-
(Continued)

19

We also find Blue Flame's argument that it is entitled to recover the amount of California's wire payment as damages under U.C.C. § 4A-404(a) to be unpersuasive. Blue Flame argues that Chain Bridge was required to pay it the full amount of California's wire transfer, because JPMorgan's cancellation of the wire transfer was not effective and U.C.C. § 4A-404(a) requires a bank to pay the beneficiary, absent an effective cancellation. Appellant's Br. at 54-55. This statute provides that: "[t]he right of a beneficiary to receive payment and damages as stated in subsection (a) may not be varied by agreement." U.C.C. § 4A-404(c).

Blue Flame argues that the statute establishes both a right to receive payment and its damages in this case. We disagree.

We read this statute to simply recognize a beneficiary's right to payment and the right of the beneficiary to recover any damages resulting from a bank's refusal to make a payment. But we find no statutory right in § 4A-404(a) to receive the amount of the payment itself as damages, regardless of whether the beneficiary incurred actual consequential damages.

In fact, the plain language of § 4A-404(a) provides that, if the bank refuses to pay, "the beneficiary may recover damages *resulting* from the refusal[.]" U.C.C. § 4A-404(a) (emphasis supplied). The official comments to the statute confirm our reading of the statute and state that a refusal to pay the beneficiary "may result in *consequential* damages." *Id.*

---

54. But, there is no material dispute of fact in the record as to whether California would have canceled the contract. Accordingly, we need not address whether Blue Flame had the capability to fill the contract to resolve this claim.

§ 4A-404 cmt. 3 (emphasis supplied).  Given this, we conclude that Blue Flame is not entitled to receive the amount of California's funds as damages under U.C.C. § 4A-404(a), absent proof of actual damages caused by the return of these funds.  Accordingly, we affirm the district court's grant of summary judgment on this claim.

D.

We also affirm the district court's dismissal of Blue Flame's tortious interference claim, because Blue Flame has not established a valid contract with California.  Blue Flame argues that California's decision to back out of its contract with Blue Flame, after receiving calls from Chain Bridge, shows that Chain Bridge interfered with its contract and business expectancy.  Appellant's Br. at 56.  The district court granted summary judgment in Defendants' favor on these claims for three independent reasons.

First, the district court found that there were issues with the validity of the contractual relationship and business expectancy between Blue Flame and California, given Blue Flame's "apparent initial misrepresentation to California authorities."  JA3090. Second, the district court found insufficient evidence to conclude that Chain Bridge had an "intent to disturb" the business relationship between Blue Flame and California.  JA3090-91.  Lastly, the district court found insufficient evidence in the record to show that Blue Flame could have fulfilled California's order and that California would not have cancelled the contract and insisted on the return of its funds.  JA3091.

Because we agree that Blue Flame has not established a valid contractual relationship with California in this case, we affirm the district court's grant of summary judgment on Blue Flame's tortious interference claims.

21

To prevail on a tortious interference claim based upon interference with a contract or business expectancy, Blue Flame must show, among other things, the existence of a valid contract or business expectancy. *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). The record shows that Blue Flame did not argue that it had a valid contractual relationship with California before the district court. JA11. Rather, Blue Flame argued that the parties stipulated that there was an agreement and that this stipulation established a valid contractual relationship. JA11; *see also* Appellant's Br. at 55.

The record evidence makes clear, however, that the parties stipulated only that there was an agreement between Blue Flame and California. JA139. Accordingly, there is no stipulation in the record that this agreement was valid. JA139.

Blue Flame argues on appeal that reversal of the district court's decision is, nonetheless, required, because the district court failed to properly address the validity of its contract with California. Blue Flame's Reply Br. at 27. But, by failing to raise this issue before the district court, or in its opening brief, Blue Flame has waived this argument. *See Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 153 n.6 (4th Cir. 2012) (concluding the appellant waived an argument "by inadequately presenting the challenge in its opening brief"); *see also* Fed. R. App. P. 28(a)(8). Accordingly, we affirm the district court's dismissal of Blue Flames' tortious interference claims, because Blue Flame has not established a valid contractual relationship with California.[5]

---

[5] Because we conclude that Blue Flame fails to establish a valid contract with California, we need not reach Blue Flame's argument that the district court erred by entering summary judgment in favor of Chain Bridge on its U.C.C. § 4A-404(a) and tortious interference claims.

E.

As a final matter, we agree also with the district court that JPMorgan is obligated to indemnify Chain Bridge for the loss and expenses resulting from the return of California's funds under U.C.C. § 4A-211(f). This provision provides that:

> Unless otherwise provided in an agreement of the parties or in a funds-transfer system rule, if the receiving bank, after accepting a payment order, agrees to cancellation or amendment of the order by the sender or is bound by a funds-transfer system rule allowing cancellation or amendment without the bank's agreement, the sender, whether or not cancellation or amendment is effective, is liable to the bank for any loss and expenses, including reasonable attorney's fees, incurred by the bank as a result of the cancellation or amendment or attempted cancellation or amendment.

U.C.C. § 4A-21l(f). The official comments to U.C.C. § 4A-211 also explain that:

> If a receiving bank agrees to cancellation or amendment under subsection (c)(1) or (2), it is automatically entitled to indemnification from the sender under subsection (f). The indemnification provision recognizes that a sender has no right to cancel a payment order after it is accepted by the receiving bank. If the receiving bank agrees to cancellation, it is doing so as an accommodation to the sender and it should not incur a risk of loss in doing so.

*Id*. at cmt. 5.

The record evidence shows that Chain Bridge accepted the payment order wiring California's funds to Blue Flame's account in the capacity of the receiving bank. JA936-37. Shortly thereafter, Chain Bridge agreed to return these funds to JPMorgan, at JPMorgan's request. JA2214. Because the record evidence shows that Chain Bridge, in the role of the receiving bank, accepted the payment order wiring California's funds to Blue Flame, and that Chain Bridge subsequently agreed to the cancellation of this payment order at JPMorgan's request, U.C.C. § 4A-211(f) governs the parties' obligations with regards to indemnification.

23

On appeal, JPMorgan advances the same three arguments that it unsuccessfully raised before the district court to argue that it has no obligation to indemnify Chain Bridge under § 4A-211(f). Namely, that: (1) § 4A-211(f) is not applicable, because Chain Bridge cancelled the payment order wiring California's funds to Blue Flame's account for its own reasons; (2) the parties agreed that JPMorgan would not indemnify Chain Bridge, displacing automatic indemnification; and (3) Chain Bridge cannot establish that its claimed loss and expenses were caused by JPMorgan's conduct. We find these arguments unpersuasive.

First, as discussed above, the record evidence makes clear that JPMorgan cancelled the payment order wiring California's funds when it sent a message to Chain Bridge *via* Fedwire asking for the return of these funds. JA1064-65. We also agree with the district court that U.C.C. § 4A-211(f) does not impose any requirement that Chain Bridge accommodate this cancellation request solely to benefit JPMorgan. There is no language within § 4A-211(f) that requires the receiving bank to have a certain subjective motivation when accepting cancellation. In fact, as the commentary to § 4A-211(f) notes, when a receiving bank agrees to a cancellation, it does so "as an accommodation to the sender" and is "*automatically* entitled to indemnification," because a receiving bank is never required to agree to cancellation once it has accepted the original payment order. U.C.C. § 4A-211(f) cmt. 5 (emphasis added). The use of the word "automatically" in the official comment to this statute also suggests that indemnification is certain, regardless of the

24

circumstances.[6]  Given this, JPMorgan is not relieved of its obligation to indemnify Chain Bridge under U.C.C. § 4A-211(f), even if Chain Bridge had its own reasons for agreeing to the cancellation of the payment order.

Second, JPMorgan's argument that the parties reached an agreement to displace the automatic indemnification default rule under U.C.C. § 4A-211(f) is unsubstantiated. JPMorgan correctly observes that it would not be obligated to indemnify Chain Bridge if the parties agreed to displace this default rule.  But, JPMorgan's reliance upon an internal Chain Bridge phone call to show that Chain Bridge and JPMorgan reached such an agreement is misplaced.[7]  We agree with the district court that this internal phone call among Chain Bridge employees does not establish a meeting of the minds between Chain

---

[6] JPMorgan argues that common law indemnification principles apply and support its argument.  Notably, the Uniform Commercial Code provides that "[u]nless displaced by the particular provisions of [the U.C.C.], the principles of law and equity . . . supplement its provisions."  U.C.C. § 1-103(b).  Under common law indemnification principles, an indemnitee whose liability is "technical, passive or secondary" can shift "the burden for the entire loss . . . to the indemnitor whose actual fault caused the injury." *White v. Johns-Manville Corp.*, 662 F.2d 243, 249–50 (4th Cir. 1981).  Where an indemnitee "active[ly]" caused the injury, "an essential predicate to the[] right to indemnification is necessarily missing." *Id.* at 250.  However, we conclude that the § 4A-211(f) displaces common law principles by allowing for automatic indemnification. *See Banca Commerciale Italiana v. N. Trust Int'l Banking Corp.*, 160 F.3d 90, 94 (2d Cir. 1998) (noting that § 4A-211 does not require the plaintiff to meet common law indemnification elements).

[7] During this internal phone call, a Chain Bridge employee (Claudia Mojica-Guadron) asked, "Are we getting an indemnity letter from [JPMorgan]?"  Evinger or Brough responded:  "They're sending a recall notice through Fed[Line] . . . just return it to the same place it came from."  JA346.  Another Chain Bridge employee then asked, "Claudia, you mentioned the indemnity letter, is that part of the procedures usually?"  Mojica-Guadron replied:  "Normally you want to get that from the other bank, just because, and in this case because we credited the customer's account."  Evinger or Brough then cut in and said:  "It's okay, don't worry about it . . . It is what it is." *Id.*

25

Bridge and JPMorgan regarding indemnification.  In fact, JPMorgan was not even aware of the conversation until this litigation ensued.  JA3094; *see also* U.C.C. § 1-201(b)(3) (an agreement could include a "bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade").

Finally, we agree with the district court that this litigation is evidence of the loss and expenses that Chain Bridge has incurred due to JPMorgan's request for the return of California's funds.  Accordingly, we affirm the district court's decision that JPMorgan must indemnify Chain Bridge under U.C.C. § 4A-211(f).

IV.

For the reasons set forth herein, we affirm the district court's grant of summary judgment in Defendants' favor on Blue Flame's U.C.C. § 4A-204(a) claim and Blue Flame's state law claims for conversion, fraud, constructive fraud, negligence and breach of contract.  We also affirm the district court's grant of summary judgment in favor of Defendants on Blue Flame's U.C.C. § 4A-404 and tortious interference claims.  Lastly, we affirm the district court's grant of summary judgment in Chain Bridge's favor on its claim that JPMorgan is obligated to indemnify Chain Bridge under U.C.C. § 4A-211(f).

*AFFIRMED.*